Case No. 16-1328 NL, Pennsylvania State Corrections Officers Association, Petitioner v. National Labor Relations Board Mr. Miller for the petitioner, Mr. Jost for the respondent I know the courtroom clears Madam Clerk, have they turned that screening off? All right, Mr. Miller, good morning. Thank you, Your Honor, and thank you for the opportunity to appear in front of this court. My name is Michael Miller from the Law Firm of Eckerd-Siemens with my colleague, Tricia Lantz. I'm here to represent the State Correctional Officers of Pennsylvania, and we turn, I guess, from the weighty issues that you previously discussed to the interests of Can you move that a little closer? to five correctional officers in Pennsylvania, which I'm sure happens in this court a fair amount. I'd like to make two fundamental points and then argue. One, the Board erred in its treatment of one of the correctional officers, Bill Park, in determining that he did not willfully refuse to take substantially equivalent employment. And two, that the Board erred in imposing an additional 24 weeks of transmarine remedy instead of the two weeks when the parties reach impasse. Do we have to reach the Park issue if we find that the Board erred in refusing to find impasse? No, Your Honor, I don't believe you do. As the minority member, Ms. Camara, pointed out, Park, both by the ALJ's determination and by the minority member's determination, was owed at least two weeks of transmarine back pay. And if the Court accepts the fact that the parties got to impasse, I think, on April 11th, after they started bargaining and imposed a two-weeks transmarine remedy, then the Park issue would be the same under either analysis. As I indicated to the Court, this case involves five correctional officers who were temporarily detailed to the State Correctional Officers Association, a statewide union, but while they were detailed to be business agents for the Correctional Officers Association, they remained paid by the Commonwealth, they got leave days by the Commonwealth, they had pension credit by the Commonwealth, and they had an absolute obligation and agreed to bargain to return to their previous position as correctional officers once their appointment ended at any particular time. Was the Commonwealth paying their full salary? The Commonwealth's paying a partial salary, and then there's an additional part made up by the Correctional Officers Association, which is my recollection. And the temporary assignment ran up to eight years in one case, right? In the case of Bill Park, he had an eight-year... Everyone had at least three years. Everyone had at least three years, but if you... Am I correct in thinking that... Well, let me ask you to clarify. What sort of obligation they undertook, the five agents undertook, to return to the Commonwealth? The record demonstrates that Mr. Park and Mr. Sonny and Mr. Blackwell, all of whom testified in front of the ALJ, indicated that they understood that once their time with the State Correctional Association ended, whenever that may have ended, that they would return to their position as correctional officers. And, in fact... That they could. I'm sorry? That they could or that they would? That they would return. Were they obligated to do so? I don't see how that's possible. Well, they could always... Your Honor, they could always leave the position if they wished, but the job as correctional officer remained open to them by agreement between the Commonwealth and the Association. And, in fact, they were always correctional officers. So that was a right they had, not an obligation. I could concede the point that they didn't have an obligation to return, but it was substantially equivalent employment to which everyone else returned. And Mr. Park admitted that he knew it wasn't a permanent appointment to be a business agent. He knew he had the right to return. Whether it was substantially equivalent is an entirely separate question, it seems to me. I thought they were technically on a leave of absence. Is that not the case? That's correct. That's what the record demonstrated, is they were given a leave of absence to serve as business agents for the state correctional officers. But during that leave of absence, they continued to accrue benefits from the Commonwealth, and they retained their position as correctional officers and had the opportunity to move back to their position as correctional officers. And, in fact, Mr. Park admitted that he had the opportunity to ask for a transfer, knew he had the opportunity to ask for a transfer to a position closer to his house, and simply chose not to. In that circumstance, it seems to me that the Board erred in substituting its judgment for the judgment of the ALJ, who was able to listen to Mr. Park and evaluate his testimony, his credibility, and determined that he had not. He had willfully decided not to take the job available to him. Can we turn to the question of impasse? Yes. As I understand it, and I'm looking at pages 222, 223 of the joint appendix, the offer by the employer, which you're representing, was to pay the gross weekly salaries of the employees, I guess, at which of the institutions, as either in their on-leave position or their regular position as guards? I believe it was on their on-leave position. On-leave positions, okay. So we don't have in the record, do we, any indication that the apparently absolutely secure one week of that gross pay was less than the two weeks' net pay required by Transmarine. I mean, this is a point that the dissenter made. Right. No, you're right, Your Honor. I don't believe that that's in the record. Assuming the gloss that the board put on the notion of what is a legal impasse was correct, it was still the case that, so far as it appears, the offer of the employer was consistent with the Transmarine minimum. That is the point that the minority member made, and we agree with that point, that no matter what the board decided with respect to the subjects discussed, which were discussed bilaterally, by the way, the issue of mileage was raised by both parties, there was no issue of bad faith that was raised by the board or by the union. And this differs from the cases in which the board relies where bargaining was different. The union here never said, well, let's continue bargaining. The union here readily agreed that they were at impasse, and we can contend that the board erred. The board put this great stress on the amount being insufficient under its view of Transmarine, but there simply appears to be no evidence that the amount offered by the employer was insufficient. And the court could, I think, fairly conclude from that point that the board's determination was not based on substantial evidence and would therefore be reversible. Well, that does seem to apply to at least four of the five. Mr. Clark, maybe in a different situation, where the maximum amount he might have been owed under the board's order would have been $3,158, and the minimum would have been the neighborhood of $2,500. We don't know when he earned his offsetting wages. But he was offered by the employer $2,151, which would be less than the minimum that he might have been due. Right, and the minority member of the board pointed out that the appropriate amount would have been a two-week amount, which is what the minority member believed. Well, a two-week amount would have been $4,300, and he was offered less than that by any account. Right, but again, the issue is if the board disagreed with it, their remedy was to order a two-week Transmarine remedy when the parties got to impasse. The board went way beyond that by simply picking August as the time that the matter would end, rather than accepting the fact that the parties agreed that they were at impasse in April. If the parties can agree that the union no longer exists, the parties can also agree that they're at impasse in April after two weeks. Both statements can be credible and can be true. The fact that both parties may have discussed mileage or may have discussed anything is not sufficient to suggest that it poisons the well, especially when the discussion is bilateral. Well, let's assume for the moment that the parties' agreement that they're at impasse is not binding on the board. Okay. And that the impasse is over in part the mileage. Is the mileage not a mandatory subject requirement? We've contended it is. The board certainly disagrees that it's not. But again, even if the board would conclude that the bilateral discussion of mileage was improper, it's not sufficient to poison the well such that the declaration of impasse was not effective. And again, Well, my premise is that maybe that's not binding on the board, right? I mean, suppose they say, well, yes, the union acquiesced in this for some illegitimate reason, or threatened, or what have you. That's not the case. I don't believe that was found in the case. No, of course not. But the question is, suppose that there's bargaining over mileage goes to impasse. I mean, if that's only a permissive subject of bargaining, is it one on which an employer or either side can go to impasse? What is the law on that question? I believe that it is a permissive subject of bargaining, not a mandatory subject. The problem is, Your Honor, that even if it is a permissive subject of bargaining, the parties can discuss it. And certainly the bilateral discussion of it shouldn't occasion a 24-week penalty by the board for exceeding. Here's my point. The question is whether if one party absolutely insists on a mileage issue either side, and there's a resulting impasse, and that's only a permissive subject, does that not mean that it's not a valid impasse? No, Your Honor. I'm afraid I would disagree with that. And if it was an impermissible impasse, I'm not exactly sure why the general counsel would stipulate to the fact that a lawful impasse had been breached. Your Honor, I see that I'm out of time. Speaking of the stipulation, on page 17 of your opening brief, you say that the union stipulated to that. Now, the stipulation of facts was entered into between the general counsel and the association 18 months after the union went out of existence. So what did you mean by that? Your Honor, let me clarify. I appreciate it. Thank you. It's true that the stipulation was entered into between the general counsel and the association prior to the hearing in front of the ALJ. The union conceded that they were at impasse in testimony in front of the ALJ. So perhaps that was – I'm not sure they were a party to that stipulation necessarily. All right. The general counsel was. Thank you, Your Honors. Mr. Jost? May it please the Court? My name is Micah Jost for the Labor Board. I'd like to begin with Judge Ginsburg's question regarding permissive versus mandatory subjects. I just couldn't find it there. And there I want to emphasize, Your Honor, that, first of all, as I heard it, counsel conceded that the debt regarding mileage reimbursements was, in fact, a permissive subject, and it was certainly either permissive or illegal. If a party insists to impasse on a permissive or illegal subject, that is a violation of Section 885. That was my understanding, but I couldn't find a validation of that. Your Honor, the Teamsters Local 515 case from this Court, which we cite on our brief at page 26 in the footnote, stands for that exact proposition. You're not shaming me, then. No, not at all, Your Honor. And this, of course, is a Transmarine case, and there was no finding of a violation. There was simply a finding that there was not bargaining that satisfied the good case. Yes, so now if, as it seems, the employer offered a dollar amount in excess of what its Transmarine obligation was, then where is the complaint? On the facts, Your Honor, it did not. What the employer offered. That's never laid out in anything the Board says. Well, it's also not challenged in anything that the employer filed with the Board. There's no argument that the, as a matter of simple math or arithmetic, that the. . . I don't believe that it was in this regard. Well, it may not have been, you know, all the pluses and minuses tabulated, but certainly the assertion as to what the relationship between what was offered and the Transmarine minimum was made. Well, in this case, Your Honor, the offer that was ultimately made, which you pointed at at Joint Appendix 223, came to a sum of zero. What it said to read from the offer is that after taking away the one week of severance, the other week, quote, the amount of back pay will be in credit only to reduce the amount of invalid and unsubstantiated mileage. In other words, the employer was insisting. . . Yeah, I think you're overlooking the language. I'm looking in the indented paragraph on page 223. PSEOA will not seek reimbursement for that amount only in any subsequent civil action. So I take it that it is. . . this offer is putting off the question of the mileage to any subsequent civil action and saying that as for this amount, you keep it regardless. The board reasonably read that language as demanding an offset of a contingent potential debt that the employer was hoping to recover in the future. As to Park, for example, against whom the employer has never sought any reimbursement, there was no separate recognition that he would receive money. Instead, there was that language that it would be a credit only, which suggests that it would not be anything at all for someone for whom it wouldn't function as a credit. And the employer, if you look at their exceptions at Joint Appendix 273, they endorsed that. They endorsed that view of their offer by accepting to the ALJ's finding, quote, that the board's order required a minimum of two weeks of back pay but did not permit a set-off against that amount. And it goes on to say that the set-off would have been for debts that it claimed. We cite a number of cases, including the Teamsters Local 705 case, where the board has explained that back pay is a public remedy. It is not something that a party can offset with debts that are alleged as being separate from the back pay remedy itself. And that's exactly what the employer insisted to impasse on doing here. It is conceded that that was a permissive subject. Therefore, it was not entitled to insist on its impasse. And the board certainly made a reasonable policy judgment that where we order back pay, and it's laid out in the clearest possible terms at the board's order at Joint Appendix 28, where the ALJ said you have to do two things. First, you have to bargain about the effects. Second, you have to pay back pay in accordance with a specific formula. And the quote in the ALJ's order there, which the board adopted, is that Transmarine, quote, sets a floor of two weeks back pay. The employer here instead believed that it could go in and try to reduce that back pay, reduce the sum it would actually pay these individuals to $0, and that is what it was not allowed to do. The employer never filed exceptions to the ALJ's order and, excuse me, didn't file exceptions to the ALJ's recommended order before the board, and it never sought review of the board's order in court. So it can't go back and challenge that order as somehow punitive or as imposing obligations that it wasn't required to actually abide by. So, again, the board reasonably looked at the language of the employer's offer, the language of the employer's own memo from April 4, in which it said that it was going to conduct a review of the two-week back pay remedy that the ALJ ordered. And then the employer confirmed that at the hearing, where it said that the parties looked at the two-week back pay period that the judge had suggested and sought offsets from that. As far as the math... Wait a minute, just one second. Yes, Your Honor. The offset they sought was from the two weeks of gross pay. Right. Not from the VAT, the net amount required under Transmarine. Right. That's correct, Your Honor. So, indeed, even the first week, which has been paid, I think, or at least is not in dispute, this first week of severance pay for everyone except Mr. Clark exceeded the two weeks net under Transmarine. I don't think that's right for two reasons, Your Honor. The first is that, again, they offered zero. They offered zero because they would be keeping it all back as a credit. If it's already paid, though. No, they already paid. It's not an offer for zero. I'm sorry, as to the second week. I agree. As to the first week. I'm saying the first week by itself was more than the required under Transmarine. And I don't think that's clear from the record at all, Your Honor. Well, it's not entirely clear with regard to Mr. Clark, but let's take Hood, okay? The net interim wage, the two weeks net of the interim wages was $448.86. You'd already received $2147. And I think part of the confusion in this case arises from the unusual payment structure that these individuals had, where they got paid in the first instance part of their salary from the union, which acted as an employer, and part of their salary came from the Commonwealth, and then the employer reimbursed the Commonwealth. So for that first week, if I'm understanding it correctly, what would have happened is the same payment structure continued. They got the ordinary payment they would have gotten from the Commonwealth, and then they also got the employer's payment, which is a smaller sum, and the employer then would have reimbursed the Commonwealth. So to count that as being going to the severance and also going to the net back pay issue, I think would be to double count the amount that they received. Is there anything in the Board's opinion going through that reasoning? I don't see any discussion of that math. And, again, it's because there was no dispute from the employer that it was trying to offset this amount. There was no argument challenging the Board's arithmetic in this regard, and so the Board didn't have the opportunity. This was never presented to the Board. So that would have been in the exceptions to the ALJ's report, is that right? That would have been the appropriate place to make that argument. And where was that to be found? The exceptions to the ALJ's recommended order are at Joint Appendix 272 and the pages that follow. And there and in its brief, the focus of the employer's argument was entirely on this idea that we're talking about mileage here. Mileage is a mandatory subject. The Board should look at our proposals and say that they are mandatory, and therefore we can insist on them to impasse. Of course, that's an argument that the employer lost on, and it instead latched on to new arguments from Member Miskimara in its arguments before this Court. Here's the second exception. The ALJ, they're accepting from, this is at 273. Yes, Your Honor. To the ALJ's finding that the Board order required a minimum of two weeks of back pay, but did not permit a set-off against that amount of an earlier payment of one week of pay. Right. So they are. Well, as to that earlier payment of one week, that's, again, the severance that the Board corrected the ALJ and said, yes, everyone has conceded all on it, that that is severance, which under W.R. Grace is properly offset. But then the employer goes on in that same exception to say that it should have been allowed to offset whatever it was alleged was improper mileage reimbursement. It wants to offset both. Right. And if it's wrong about the mileage, it still has complained. I thought you were saying they never took an exception, but they've accepted to the denial of cognizance over the first week's severance pay. And? And saying that that is permissible. And the Board agreed with that, and if I understand. Okay, now once the Board's agreed with that. Right. It follows that if that amount is more than they would do under Transmarine, does it not? Then employers discharge this obligation. I guess I disagree with your premise that this was more than the employer was required to pay, because otherwise why would it have even sought a credit in regard to the second week? Well, why would it have? Well, I mean, the same thing. Transmarine requires they give you two weeks of your net pay. Right. I'll give you two weeks of your gross pay subject to some offsets. That's the proposal. But I've already given you one week of your gross pay. So I've covered what the Board required. I guess without having the Board's actual math before me and without having the Board having the math. Is it at all clear the Board did any math? The math would have been done in the compliance specification. The only math I saw was two weeks is more than one. I mean, two weeks minus one week is less than two weeks, which is, of course, true. It's an interesting argument, Your Honor, and it's an argument that the Board that should have been placed before the Board in the terms that Your Honor is describing it so that the Board could address this. So you're saying the exception is not sufficient? I don't read that exception as remotely raising the issue that you're describing here. The employer there was simply saying, we disagree that there was a minimum amount here of two weeks that we weren't allowed to take away from. The Board said, yes, there was. Well, no, they didn't say it's not. They said, except to the evidence finding that the Board order required a minimum of two weeks but did not permit a set-off against that amount of an earlier payment of one week. I mean, that's sufficient, isn't it, to say, look, we paid one week, and that should be noticed. That should be taken into account. I think that is an argument that could have been made. I see that as an expansive argument. Well, maybe they didn't elaborate on this exception in their reading to the Board. I don't know. They certainly didn't elaborate on it in any way that put the Board on notice that that was the contention they were trying to advance, and that's why the subject hasn't been briefed or argued in any sort of detail before the Court. So, again, it's waived both as a matter of section 12. It has been briefed. I mean, it's in the blue brief. I mean, before the Board. Oh, I'm sorry. I thought you were talking about before us. I agree that it hasn't been briefed before the Board. Excuse me, before the Board or before the Court. I think you're wrong. In the form that Your Honor is arguing. But I respectfully disagree with that reading of their brief, and that's why we didn't come back in our brief and try to present a detailed calculation. Is the employer's brief to the Board in the J.A.? Yes, it is. It's sort of unusual that that would be contained in the Joy Appendix, but in this case we do have it. It follows immediately after their exceptions. Their argument in that regard starts at Joy Appendix 286, and there again they focus on the concept that this was a mandatory subject because mileage reimbursement in the abstract is perhaps a mandatory subject in their view, and they tried to stretch that into saying that offsetting a debt is also a mandatory subject, and that's contrary to longstanding Board law, and they've now abandoned that in the argument today. So unless the Court has any further questions, we would ask the Court simply to focus on the arguments that were properly made to the Board and preserved before this Court, which provide no basis for overturning the Board's reasonable policy judgments and fact-finding in this case. Thank you. Thank you. Does Mr. Miller have any time left? All right, why don't you take one minute? If you don't want it, that's fine. Okay, call the next case.
judges: Henderson, Williams, Ginsburg